**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JULIA WRIGHT, | |
| Plaintiff, | |
| v. | Case No. _____ |
| UNIVERSITY OF MARYLAND, | **COMPLAINT**<br>**(Violations of Title VII, and Title IX)** |
| Hon. Brian E. Frosh<br>Attorney General of Maryland<br>200 St. Paul Place<br>Baltimore, Maryland 21202 | **Jury Trial Requested** |
| Defendants. | |

**COMES NOW** the Plaintiff, Julia Wright, by and through the undersigned counsel, and for her cause of action states the following:

## INTRODUCTION

1.     Plaintiff Julia Wright ("Wright" or "Coach Wright") brings this action against the Defendant University of Maryland ("UM") for damages, equitable and other relief, and for gender discrimination and retaliation in her employment in violation of her rights under federal law.

2.     Coach Wright was impacted by gender bias and stereotypes in the assessment of her performance and retaliated against for bringing forward concerns and complaints of gender inequities.

3.     Coach Wright was held to a different and higher standard than male coaches who were given more resources and opportunities to be successful in their programs than Coach Wright.

4.     Coach Wright was fired for advocating on behalf of female student athletes to be treated fairly and equitably.

1

5.     Coach Wright was retaliated against after advocating that her program not be ignored and provided with less resources than programs that were coached by males.

6.     Defendant UM chose to fire a great coach because she advocated for gender equality on behalf of herself, her program, and her student athletes, in an effort to silence her and others who might bring concerns forward.

## SUMMARY OF THE CLAIMS

7.     This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (hereinafter "Title VII") and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. (hereinafter "Title IX.

8.     Title VII protects employees from gender-based discrimination and retaliation in the terms and conditions of their employment.

9.     Title IX prohibits gender discrimination in educational institutions that receive federal financial assistance like UM.

10.     Title IX prohibits gender discrimination in all of UM's programs and activities including athletics.

11.     Title IX ensures equal access to facilities, equipment and funding for male and female college student athletes.

12.     Title IX also protects students and faculty who complain about equity issues, including equal access to opportunities and competitiveness in athletic programs and from retaliation.

13.     Title VII employment claims can be brought contemporaneously with Title IX employment discrimination claims.

14.     Female coaches are often judged differently and more harshly than their male coach counterparts by administrations, their student athletes, and parents. They are often not given the same respect for their coaching decisions and expected to behave in a manner that is more consistent with gender stereotypes about females. For example, female coaches are expected to be reserved, kind, and motherly to their student athletes as opposed to loud, assertive, or stern.

15.     These double standards result in student athlete complaints about coaches that are the direct result of gender bias. Universities that rely in whole or in part upon student complaints of their coaches premised upon bias or stereotypes are liable for gender discrimination under Title IX and Title VII.

16.     Universities also react and respond differently to complaints from student athletes about their coach based on the gender of the coach. For example, university administration will often coddle and appease female student athletes who complain about their female coach yet ignore or overlook similar complaints from male student athletes about their male coach.

17.     The result of double standards (gender bias) in how female and male athletes are treated places male athletes who complain about their coaches at risk, as their complaints are often ignored. Likewise, it places female coaches at risk, as they may receive more student complaints and are held to a higher standard by the administration.

18.     Universities may also have gender biases in how they manage and measure coaches. As a result, they may hold female coaches to a higher standard, pay them less, and value their teams less favorably.

19.     Any of these biases or stereotypes - relying on bias of players towards coaches, treating the complaints of female student athletes differently than male student athletes, or holding

the female coach to double standards – are all forms of gender discrimination that violate the purpose and scope of Title VII and Title IX.

## JURISDICTION AND VENUE

20.     Jurisdiction and venue exist in this Court, as the majority of events giving rise to this lawsuit occurred in College Park, Maryland.

21.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and the Court's pendent claim jurisdiction under 28 U.S.C. § 1367(a).

22.     Venue is appropriate in this District under 28 U.S.C. §§ 1391(b) and (c).

23.     Coach Wright's EEOC charge against Defendant was filed on February 5, 2020.

24.     The EEOC charge alleged, inter alia, that Defendant discriminated against Coach Wright on the basis of sex and terminated her in retaliation for protected complaints.

25.     The EEOC issued a Notice of Right to Sue dated May 14, 2021. This action is being brought within ninety (90) days from the issuance of the Notice of Right to Sue.

## PARTIES

26.     Plaintiff Julia Wright, a female, is a current resident of Commerce City, Colorado, previously having lived in Washington D.C.

27.     Defendant UM is an institution of higher education located in College Station, Maryland, whose athletic teams participate in the NCAA Division I Big 10 Conference.

## STEREOTYPE AND BIAS RISK; STATUTORY PROTECTIONS

**Risks of Gender Stereotypes**

28.     A female is expected to behave in a manner that is consistent with societal stereotypes about females.

4

29.     Societal expectations of females include that they identify with the role of family caretaker/nurturer, not the role of "leader," such as a head coach.

30.     The role of leader, or head coach, was designed and remains defined as a "male-type" task. Coaching behavior is, therefore, supposed to be consistent with expectations of how a male should behave, not a female. The fact that leader/head coach positions remain associated with male-type tasks or behavior as results from stereotypes is confirmed by social science.[1]

31.     These expectations or stereotypes about the roles of females create what is called a "lack of fit" or "role incongruity" when women hold high-level positions such as administrator or head coach.

32.     This lack of fit leads students, parents, and administrators to evaluate the behavior of female coaches differently than they evaluate the behavior of male coaches. This risk of gender stereotyping also exists regardless of whether the athlete is male or female.[2]

33.     As a result of stereotypes, a female coach who behaves in a stereotypically feminine manner is blamed for being too soft as a coach. A female coach who behaves in the manner in which we expect head coaches to behave (i.e., male-type tasks and behavior) is often blamed for being too harsh.

34.     Males are not similarly evaluated based on this double standard.

---

[1] Burton, Laura J., *Underrepresentation of Women in Sport Leadership: A Review of Research*, Sport Mgmt. Rev., Elsevier, vol. 18(2), pp. 155–165 (2014).

[2] "Qualitative research has reported that 8 out of 12 collegiate female athletes (basketball, softball, golf, cross-country, track and field and soccer) also preferred a male coach." Fisher *et al.*, *Attitudes Toward and Preferences for Male and Female Personal Trainers*, International Journal of Exercise Science, Vol. 6(4) p. 257 (2013). *See also* Fasting, K. & Pfister, G., *Female and male coaches in the eyes of female elite soccer players*. Eur. Physical Educ. Rev. 6(1); 91–110 (2000); Frankl, D. & Babbitt, D.G., *Gender bias: a study of high school track and field athletes' perceptions of hypothetical male and female head coaches*. J. Sport Behavior 21; 396–407 (1998); Frey, M., Czech, D.R. *et al.*, *An exploration of female athletes' experiences and perceptions of male and female coaches*, The Sport J. 9(4) (2006).

35.     The double standards, "lack of fit" or stereotypes, often result in student-athlete complaints against female coaches.

36.     These student-athlete complaints occur despite the fact that the female coaches are not coaching any differently, and certainly no more harshly, than male coaches.

**Segregation of Women's Sports/Leadership Roles As Evidence of Stereotype**

37.     Women remain, disturbingly, effectively segregated in college athletics.

38.     Statistics show that 75% of athletic directors are male, 97% of men's teams are coached exclusively by men, and men serve as head coaches of 55% of women's teams.[3]

39.     The gender segregation in college athletics is not "separate but equal," but rather a one-way segregation that gives men exclusive, complete access to coaching men, and disproportionate access to coaching women.[4]

40.     Regardless of physical differences between male and female athletes, there is no reason (other than gender stereotypes) for a university to recruit and hire only men to coach men while permitting men to hold coaching positions on women's teams.[5]

---

[3] As of 2014, the data showed that 57.1% of women's teams are coached by males and 97% of men's teams are coached by males.  77.7% of athletic directors are male. Acosta and Carpenter, *Women in Intercollegiate Sport* (2014).

[4] "Imposing sex segregation on sports is problematic for many reasons. Sex segregation reflects and reinforces a binary view of both sex and gender unsupported by science. It communicates that women are physically unable to compete against men, even though research indicates considerable variation among individual athletes and different sports, and further reveals that attributes other than sex are often more important determinants of athletic ability. It reinforces unfounded gender stereotypes that harm both women and men. And sex segregation uncritically prioritizes athletic activities involving strengths typically associated with male bodies, without requiring us to ask why we view these strengths as the most important in the first place." Leong, *Against Women's Sports*, Washington University Law Review, Vol 95:1 (2018).

[5] "Based on our results and other findings (e.g., Berri et al. 2009) that have examined the impact of head coaches on teams' and players' performances, it appears that both men and women are readily equipped for success in the coaching profession (and in some cases, women coaches have been more successful than the male coaches they replace; Aicher and Sagas 2010). As such, our results imply that the absence of women coaches for men's teams is not grounded in any objective or reliable evidence."  Darvin, L., Pegoraro, A., & Berri, D*., Are Men Better Leaders? An Investigation of Head Coaches' Gender and*

**Gendered Socialization Differences**

41.     Gendered socialization refers to the differences in how young men and young report their emotional responses to perceived risks of emotional or physical harm.

42.     Young women are socialized to report emotion and risk more openly to each other, to parents, and to other third parties, while young men are socialized to refrain from reporting such emotions or risks.

43.     The differences in the amount, type, or manner of reporting feelings or emotional risk do not mean men and women feel emotion differently.

44.     The socialized difference in how men and women report emotion also does not mean men are emotionally stronger or women weaker.

45.     Men and women feel emotion (fear, worry, insecurity, threat) in similar ways, but they are socialized to express that emotion differently.

46.     Male and female athletes will often choose to express feelings (fear, concern, worry, doubt, insecurity, etc.) that are a normal part of being a young adult and/or a collegiate athlete in different ways, even if the emotions they feel, as men and women, are the same.

47.     As a result of these gendered socialization differences, coaches of female programs receive more student-athlete complaints when compared to coaches of male programs, regardless of whether the coaches are behaving any differently toward the athletes than coaches of male programs.

48.     UM, as with most universities, has experienced these differences in the number and manner of how athletes on male teams complain compared to female teams.

---

*Individual Players' Performance in Amateur and Professional Women's Basketball*, Sex Roles, 78:455–66 (2018).

49.     UM, as with most universities, has several outlets for student athletes to report concerns about coaching, including all-sport surveys, exit interviews, a formal student-grievance process, and informal verbal or written complaint channels (e.g. reports to other coaching staff, administration, academic advisors, etc.).

50.     As a result of gendered socialization, educational institutions also respond differently to student athletes based on their gender.  They will often only respond to complaints made in a certain way or using a certain vehicle—written or emailed complaints or other methods used more often by women. Universities often will not review, react or respond to the manner of complaints used more often by males—such as all-sport surveys or complaints to counselors or academic advisors.

51.     As a result of the gendered approach to student complaints, universities often coddle and patronize concerns raised by female athletes, while ignoring or overlooking male athletes who raise complaints about legitimate concerns.

52.     A female coach who engages in normal coaching behavior will be evaluated differently (and less favorably) than a male coach who engages in that same normal coaching behavior.

53.     A female athlete who has an emotional response to normal coaching behavior is more likely than a similar male to report this response to parents or to administration, and the university is more likely to react to that report by taking action that will undermine the female coach.

54.     Athletes who report normal coaching behavior will often label that behavior as harmful by using words like, bully, abuse, isolation, fear, harassment or pressure.

55.     The labels used by athletes who report normal coaching behavior of female coaches are most often reflecting the differential evaluation of the female coach's behavior, not reporting objectively problematic coaching methods.

56.     When a report is made about the behavior of a female coach, it is more likely that a university will fault the female coach than it would fault a male coach for engaging in the same behavior.

57.     Because of gender stereotypes and gendered socialization, a university (through administrators, investigators, board members, trustees, etc.) will fault the female coach in at least two ways.

　　a.　The university will fault the female coach for the *mere fact that the athletes claim to be harmed or feel negative emotion.*

　　b.　The university will more quickly, and with less evidence, fault the female coach for any mistake, act of poor judgment or out-of-context comment.

58.     The result is that a complaint applying a label to a female coach (e.g., "bully") becomes more easily believed and more easily results in blame/fault placed on the female coach with less evidence.

59.     Complaints about the behavior of Coach Wright were made, at least in part, because of gendered socialization and in part because of the differential gendered expectations placed on them as female coaches.

60.     Any of these biases and stereotypes—relying on biased student-athlete complaints against coaches, treating the complaints of female athletes differently than those made by male athletes, or holding female coaches to double standards—are forms of gender discrimination that violate the purpose and scope of state discrimination laws

61.     If any complaints about Coach Wright were the result of gender differences in how athletes complain or gender stereotypes, that could not have formed a legitimate basis to evaluate or terminate her from her employment.

62.     That is especially true in light of the male coach who was hired to replace Coach Wright. This male coach has been the subject of many student-athlete complaints, to the point where several female student athletes are transferring; yet the male softball coach has not been terminated.

## TITLE IX REGULATIONS

63.     The Supreme Court of the United States has held that Title IX has an implied private right of action for discrimination and retaliation. *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979); *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982); *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 179 (2005).

64.     The Supreme Court of the United States has held that Title IX cases provide for remedies including, but not limited to, monetary damages and equitable relief. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255-56 (2009); *Barnes v. Gorman*, 536 U.S. 181, 187-88 (2002); *Davis v. Monroe County Bd. of Educ.*, 526, U.S. 629, 633 (1999); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 62–63 (1992).

65.     UM is a "recipient" of federal financial assistance within the meaning of Title IX. 34 C.F.R. § 106.2(h).

66.     As a recipient of federal financial assistance, UM must agree to comply with Title IX regulations codified at 34 C.F.R. § 106 et seq. as a condition precedent to receiving federal financial assistance. 34 C.F.R. § 106.4 ("Assurance required").

67.     UM's Title IX obligations include protecting UM students and employees from gender discrimination in education and employment.

68.     The Title IX Education Programs or Activities Regulations prohibit UM from providing any aid, benefit, or service to a student on the basis of sex including but not limited to actions that would:

> …
> (1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;
>
> (2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;
>
> (3) Deny any person any such aid, benefit, or service;
>
> (4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;
>
> (5) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;
>
> (6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;
>
> (7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.
> …

34 CFR § 106.31(b).

69.     The Supreme Court upheld the validity of the employment regulations in *North Haven Bd. Of Educ. v. Bell*, 456 U.S. 512 (1982). *See also Brine v. Univ. of Iowa*, 90 F.3d 271, 275-76 (8th Cir. 1996) (looking to 34 C.F.R. § 106.51 regulations to define Title IX claim in conjunction with statute).

70.     The Title IX Employment Regulations found in 34 C.F.R. § 106, Subpart E protect against various forms of employment discrimination including but not limited to:

> (1) Recruitment, advertising, and the process of application for employment;
>
> (2) Hiring, upgrading, promotion, consideration for and award of tenure, demotion, transfer, layoff, termination, application of nepotism policies, right of return from layoff, and rehiring;
>
> (3) Rates of pay or any other form of compensation, and changes in compensation;
>
> (4) Job assignments, classifications and structure, including position descriptions, lines of progression, and seniority lists;
>
> (5) The terms of any collective bargaining agreement;
>
> (6) Granting and return from leaves of absence, leave for pregnancy, childbirth, false pregnancy, termination of pregnancy, leave for persons of either sex to care for children or dependents, or any other leave;
>
> (7) Fringe benefits available by virtue of employment, whether or not administered by the recipient;
>
> (8) Selection and financial support for training, including apprenticeship, professional meetings, conferences, and other related activities, selection for tuition assistance, selection for sabbaticals and leaves of absence to pursue training;
>
> (9) Employer-sponsored activities, including those that are social or recreational; and
>
> (10) Any other term, condition, or privilege of employment.

…

34 C.F.R. § 106.51(b).

71.     UM's obligations pursuant to the Title IX regulations also protect its students and employees from retaliation for making complaints protected under Title IX.

72.     Title IX incorporates the anti-retaliation provisions of Title VI of the Civil Rights Act of 1964. 34 C.F.R. § 106.71 (incorporating the retaliation language of the regulations under Title VI [34 C.F.R. § 100.7(e)]).

73.     Title IX makes it unlawful to retaliate against individuals—including coaches—not just when they file a complaint alleging a violation of Title IX, but also when they participate in a Title IX investigation, hearing, or proceeding, or advocate for others' Title IX rights.

74.     In 1974 and 1975, Congress formalized its intent to include athletics programs under the protection of Title IX when it successfully proposed regulations that specifically addressed athletics. S. Conf. Rep. No. 1026, 93rd Cong., 2d Sess. 4271 (1974); 34 CFR § 106.41.

## STATEMENT OF FACTS

75.     Defendant hired Coach Wright in approximately July of 2015 as Head Women's Softball at the University of Maryland.

76.     Coach Wright took over the softball program where she was the third head coach hired in three years.

77.     There was no stability within the softball program at this time and many dissatisfied student-athletes.

78.     Coach Wright knew she was going to have to rebuild the team.

79.     She discussed rebuilding the team with her supervisors on several occasions, which they confirmed that rebuilding the team would be a challenge.

80.     Coach Wright talked with her direct supervisor, Assistant AD Kristen Brown, about how much of a struggle it would be to win because the team was so depleted for a failure to recruit prior to Coach Wright taking over the program.

81.     A program cannot be successful if a coach fails to recruit.

82.     The previous coach had only secured two commitments to play softball at Maryland, which is extremely deficient in a Division I school because softball recruiting can start as early as eighth grade.

83.     When a sports program is depleted of talented athletes because of a failure to recruit, it often takes years to rebuild the program in order for it to be successful.

84.     Coach Wright knew that she needed to rebuild the program and make decisions that some student-athletes would dislike.

85.     These decisions were made to try and take the program in a successful direction.

86.     To be successful or to attempt to lead a successful team, Coach Wright changed up the lineup.

87.     A change in the lineup is a decision every coach makes in order to have or attempt to have a successful team.

88.     Coach Wright spoke with students regarding their performance, both individually and as a group, and attempted to lead them to performing better as coaches do.

89.     When students did not progress in their overall performance, they did not receive as much playing time.

90.     This led to a complaint by a mother for not allowing her daughters to as much time as the *mother thought* they should receive.

91.     In regard to the parent-complaint, Athletic Director Kevin Anderson told Plaintiff this complaint was "baseless."

92.     Plaintiff believed there was support from the administration as male coaches are permitted to make coaching decisions regarding their roster and playing time every day.

93.     Additionally, AD Evans made comments that the family was being unreasonable and "fucking crazy."

94.     The athletic administration also received an anonymous complaint from someone by the name of "Tom Snitch"

95.     "Tom Snitch" was the uncle of a player who had received less playing time and had been talked to repeatedly by Coach Wright about changing her attitude and accepting the new coaching methods Coach Wright was attempting to instill.

96.     Tom Snitch then made false allegation that Coach Wright was engaging in criminal activities by making the students run barefoot in the winter.

97.     Coach Wright explained that was false, that she never made the students run barefoot, and some students chose to run in their socks on a 60-degree-day in January rather than change out of their cleats into their running shoes.

98.     Defendant fully accepted her explanation.

99.     Coach Wright also was accused of withholding food, which was false.

100.    Defendant knew or should have known that Coach Wright never withheld food, and instead worked with a nutritionist who limited the amount of junk food student athletes should eat.

101.    Additionally, there were expense reports that detailed the amount of food that was purchased for the team.

102.    Defendant, after she was terminated and part of the shifting reasons, also tried to hold Coach Wright responsible for a workout that was developed by the strength coach.

103.    A student athlete had a medical condition, which had never been disclosed to Coach Wright by the student athlete or the training staff.

104.    The student got sick during the workout, and the trainer was called immediately to assist.

105.    Once Coach Wright learned of the student athlete's medical condition, she tailored the workouts differently to provide for an accommodation.

106.    This was all known to and approved by the athletic department administration.

107.    Yet despite having approval of her coaching methods and affirmation that the complaints about her were baseless at the time they occurred, Defendant has now changed its position and used it in the decision to terminate her.

108.    In May 2018, a few members of the team again made complaints to Asst AD Brown about lack of playing time.

109.    Asst AD Brown investigated by talking to the rest of the team and the assistant coaches, who would not and could not corroborate those complaints as the lack of playing time was justified.

110.    Asst AD Brown confirmed and found that the complaints were merely coaching methods that every coach at UM is free to utilize, and that there was no basis for the complaints nor any basis for discipline issued to Coach Wright.

111.    Coach Wright also received a complaint by a student athlete who had not been playing very well.

112.    When Coach Wright tried to hold her accountable and coach her to play better, the student athlete screamed at Plaintiff and her assistant coaches before pre-game warmups.

113.    Plaintiff and the assistant coaches tried to talk with this student-athlete, but she refused.

114.    Plaintiff was then berated by this student-athlete's parents which Plaintiff stood by and took despite this being completely inappropriate and unprofessional and 15 minutes prior to the game.

115.    When Plaintiff tried to respectfully speak with the student-athlete and her parents after the incident to let them cool down, they again refused.

116.    Coach Wright told Defendant about what happened, but nothing was done.

117.    Those parents likely would not have yelled at a male coach in that manner, but more importantly, the administration would have supported the male coach.

118.    The athletic administration did not support Coach Wright like they supported male coaches who engaged in similar or worse behavior.

119.    The former football coach received complaints of abuse by male athletes, but those complaints were ignored.

120.    The former football coaches' coaching methods lead to the death of a student athlete, but the football coach was not fired.

121.    Instead, he was brought back to coach the team and it was not until the team made a public display of walking out on the coach indicating they did not feel safe playing for him after their teammate died from being overworked in a practice, that UM fired the male coach.

122.    Besides not having enough Division I athletes to be successful in the Big 10, Coach Wright also noticed that the facilities were substandard.

123.    In August 2015, she provided administration with "Project Pride" which was a PowerPoint where Coach Wright advocated for the team to have better facilities.

124.    Coach Wright also advocated for her team over the years to ensure the field was being maintained properly.

125.    Coach Wright had to step in several times because the field was not being watered and not maintained properly, which was causing unsafe conditions for the student athletes.

126.    When Coach Wright advocated that her field be properly maintained, she was labeled as difficult to work with.

127.    Coach Wright often had to water and tend to the field herself to make sure it was safe for her athletes.

128.    Coach Wright specifically complained to Asst AD Brown about having to perform the maintenance on her field and asked whether the men's basketball coach was required to monitor and ensure the gym floor was safe for his athletes. Specifically, she asked if the men's basketball coach complained the floor was too slippery if he was personally required to fix the floor.

129.    Asst AD Brown told her that was a good point, but nothing was done, and Coach Wright continued to have to water the field and tend to it herself.

130.    When it came to matters of discipline or change to the team, or interactions with other departments, Coach Wright informed either Asst AD Brown or AD Evans about her intentions, they discussed them with her, and gave their approval or Coach Wright would not have done them.

131.     Defendants also now claim that part of the reason Coach Wright was terminated was because student athletes elected to transfer to other schools.

132.    Coach Wright was replaced by a male in September 2019.

133.    The male coach has had at least three student athletes transfer out of the program and two potential student athletes decommit to UM during his first year.

134.    There are three additional softball student athletes that are transferring from UM this year.

135.    Student athletes transfer for a number of reasons, including in and out of the men's teams.

136.    Transfers are so expected in the NCAA, there is a transfer portal that athletes must enter, which provides the student the opportunity to look at other schools and coaches the opportunity to recruit from the transfer portal.

137.    UM utilizes that transfer portal to recruit athletes and also allows athletes to enter into the transfer portal when they are dissatisfied with their experience at UM.

138.    Defendant also claimed to the EEOC that Coach Wright had assistant coaches leave the program, which was part of the reason she was fired.

139.    Male teams and male coaches at UM have assistant coaches leave regularly, but it is not held against male coaches.

140.    Assistant coaches often look to leave programs for a number of reasons, including to advance their career or moving with their family.

141.    Whenever Coach Wright had an assistant leave, it was discussed at length with her supervisor Asst AD Brown or AD Evans or AD Anderson.

142.    There was one assistant coach that Coach Wright determined was not a good fit for her program, to which she discussed with AD Evans. AD Evans told her, "Julie, everyone makes a bad hire."

143.    Despite Defendant approving the reasons for assistant coaches leaving or being asked to leave, Defendant is now attempting to hold those same approvals against Coach Wright.

144.    Defendant has also used her overall record, including the record where she was told she knew she was not going to be successful in winning games because the team was so depleted, as a reason to terminate her.

145.    Comparatively to the men's teams, Coach Wright was not given the proper resources in order to be successful. Specifically, Coach Wright brought forward concern that the team could not be successful because the softball team was not getting things like the men's teams received, including but not limited to:

    a.    A qualified strength and conditioning coach;

    b.   A full-time trainer;

    c.   A competent and qualified trainer;

    d.   A competent and qualified media person;

    e.   A media person and trainer who did not go out drinking together while on road trips in front of the student athletes and then discuss it with them;

    f.   Qualified facilities staff;

146.    Coach Wright also complained that the quality of support staff the softball team was provided was substandard because they used softball as some sort of training ground, and if the individual was any good, they got transferred from softball. This meant that Coach Wright did not have consistent individuals to help her team in the areas of sports psychologists, media, nutrition, academic advisors, strength coaches, etc.

147.    Coach Wright was terminated because of her gender and in particular gender stereotypes, which led to complaints about her that resulted in the decision to terminate her based on those complaints.

148.    Her coaching methods and behavior were open to anyone at Defendant and those who watched her and know her behaviors or methods never crossed a line.

149.    If she had been too loud, too demanding, to direct, etc. let alone abusive, it would be a simple matter for anyone to evaluate her at a practice or talk to the athletes.

150.    Plaintiff was not given the same treatment as male coaches and was not permitted normal, everyday, coaching decisions.

151.    Some male coaches were allowed to cut players, yell at players, or coach in methods that resulted in death.

152.    Some male coaches received complaints from student athletes.

153.    Some male coaches have not been successful in regard to their record.

154.    These male coaches were allowed to maintain their jobs with Defendant.

155.    Due to Defendant's double standard and gender bias, Plaintiff was terminated.

156.    Plaintiff was terminated August 7, 2019.

157.    In order to try and salvage her career, Plaintiff was allowed to say she resigned—despite being terminated.

## FIRST CAUSE OF ACTION
### Violation of Title VII
### (Gender Discrimination & Retaliation)

158.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

159.    Coach Wright has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

160.    Under the provisions of Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex or to retaliate against her for engaging in activity protected by Title VII.

161.    At all times, Defendant was an "employer" within the meaning of Title VII.

162.    Defendant's conduct was discriminatory against Coach Wright with respect to failing to treat her equally to male coaches, allowing her to be discriminated against by her supervisors, subjecting her to different and heightened scrutiny at work, holding her to different and higher standards, and retaliating against her for engaging in conduct protected by Title VII, all in violation of Title VII.

163.    Defendant discriminated against Coach Wright on the basis of gender in violation of Title VII by holding her to a different standard than similarly-situated men in the terms and conditions of her employment, including her termination of employment

164.    As a result of Defendant's conduct, Coach Wright suffered loss of employment, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

165.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII, including reinstatement, front pay, training, oversight of the athletic department and UM to ensure gender equity throughout the university, and any other equitable relief deemed appropriate by the Court.

**SECOND CAUSE OF ACTION**
**Violation of Title IX**
**(Gender Discrimination & Retaliation)**

166.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

167.    Defendant's educational programs and activities receive federal financial assistance within the meaning of Title IX.

168.    Title IX regulations require Defendant to take such remedial action as is necessary to overcome the effects of sex discrimination in violation of Title IX.

169.    Through comments and behaviors motivated by gender bias, Defendant also discriminated against Coach Wright's female student athletes in violation of Title IX, 34 C.F.R. § 106.41, for which Coach Wright was advocating on her student-athlete's behalf. Defendant did not provide female softball players equal athletic opportunities in several areas which include but are not limited to:

    a.   The provision of equipment and supplies;

     b.   Scheduling of games and practice time;

     c.   Travel and per diem allowance;

     d.   Opportunity to receive coaching;

     e.   Assignment and compensation for coaches;

     f.   Provision of practice and competitive facilities;

     g.   Provision of medical and training services; and

     h.   Publicity.

170.    When Coach Wright complained about discriminatory treatment of her students she was retaliated against by the administration.

171.    After Coach Wright complained about gender inequities, she was retaliated against by being terminated in violation of Title IX, among other things.

172.    Defendant violated Coach Wright's rights, and the rights of female student athletes, when Coach Wright was fired her for advocating for female student athletes to receive equal opportunities to receive competitive coaching, the provision of equipment and supplies, scheduling of games and practice time, provision of competitive facilities, publicity and other opportunities afforded by Title IX and as required by 34 C.F.R. § 106.41, et seq.

173.    Title IX incorporates the anti-retaliation provisions of Title VI of the Civil Rights Act of 1964. 34 C.F.R. § 106.71 (incorporating the retaliation language of the regulations under Title VI [34 C.F.R. § 100.7(e)]).

174.    As a result of Defendant's actions, Coach Wright has in the past and will in the future suffer injuries and damages as set forth above.

175.     As a result of Defendant's actions, Coach Wright seeks monetary damages including, but not limited to, economic and career loss and damages for the indignity and humiliation of being retaliated against.

176.     The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII and Title IX including, but not limited to:

    a.   Reinstatement of Plaintiff to her position as head coach;

    b.   Training on the removal of implicit bias and gender stereotypes from the assessment of female students and female coaches;

    c.   A court order requiring that the Defendant be audited regarding its compliance with Title IX and that any failures or violations of Title IX be immediately remedied by the university;

    d.   That Defendant be required to take steps to not only comply with Title IX, but to provide additional remedies and funding to make up for shortcomings and the failure to make progress as required by Title IX; and

    e.   Such other and further relief under Title IX as needed to make Coach Wright and other females similarly situated at Defendant whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Coach Wright requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; reinstatement; compensatory damages for loss of employment, emotional pain and suffering, indignity, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses; equitable relief; and any other relief the Court deems just and necessary to make

Plaintiff whole and effectuate the purposes of Title VII and Title IX; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## JURY DEMAND

**COMES NOW** the Plaintiff, Julia Wright, and hereby requests a trial by jury in the above-captioned matter.

_____/s/ David R. Cashdan_____
USDC MD No. 08977
David R. Cashdan
dcashdan@cashdankane.com
Cashdan & Kane, PLLC
1717 K Street NW, Suite 1110
Washington, D.C. 20006
Telephone: (202) 862-4330


_____
Jill Zwagerman, *Pro Hac Vice Pending*
jzwagerman@newkirklaw.com
Thomas Newkirk, *Pro Hac Vice Pending*
tnewkirk@newkirklaw.com
NEWKIRK ZWAGERMAN, P.L.C.
521 East Locust Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
Fax: (515) 883-2004

ATTORNEYS FOR PLAINTIFF